O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER KEARNEY, NANCY KEARNEY, CHARLES MOORE, and SHARI MOORE,<br><br>Plaintiffs,<br><br>vs.<br><br>HYUNDAI MOTOR AMERICA,<br><br>Defendant. | CASE NO. SACV 09-1298-JST (MLGx)<br><br>**ORDER (1) GRANTING JOINT MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENT (Doc. 95) AND (2) GRANTING IN PART MOTION FOR ATTORNEY FEES, EXPENSES, AND INCENTIVE AWARD PAYMENTS (Doc. 97)** |

Before the Court are the parties' Joint Motion for Final Approval of Class Settlement ("Settlement Motion") and Plaintiffs' Motion for an Award of Attorneys' Fees, Expenses, and Incentive Award Payments ("Fees Motion"). (Settlement Mot., Doc. 95; Fees Mot., Doc. 97.) Plaintiffs also filed, pursuant to the Court's Order Granting Preliminary Approval of the Settlement, a supplemental memorandum regarding class members' support for the proposed settlement. (*See* Doc. 119.) The parties also filed a Joint Supplemental Memorandum of Law Regarding Settlement Administration and Class Members' Reactions to the Settlement, which discussed class members' objections. Finally, the Court ordered supplemental briefing on the effect, if any, on this proposed settlement of the Ninth Circuit's recent decision in *In re HP Inkjet Printer Litigation*, No. 11-16097, --- F.3d ----, 2013 WL 1986396, *1 (9th Cir. May 15, 2013), which the parties have now filed. Having reviewed the papers, held a fairness hearing, and taken the matter under submission, the Court GRANTS the Settlement Motion and GRANTS IN PART the Fees Motion.

## BACKGROUND

Plaintiffs Christopher Kearney, Nancy Kearney, Charles Moore, and Shari Moore filed their Second Amended Complaint—the operative complaint—on July 15, 2010, asserting claims for violation of California's Consumers Legal Remedies Act (CLRA), California Civil Code §§ 1750, *et seq.*; violation of California's Unfair Competition Law (UCL), California Business & Professions Code §§ 17200, *et seq.*; breach of express warranty, California Commercial Code § 2313; and breach of implied warranty of merchantability, California Commercial Code § 2314. (Second Am. Compl. ("SAC"), Doc. 30.)

This case concerns an alleged design defect in the Occupant Classification Systems ("OCS") of 2006-2009 model year Hyundai Motor America ("Hyundai") vehicles. (*See* SAC ¶ 1.) Hyundai's OCS is part of the advanced air bag system of its vehicles. (*Id.* ¶

19.) It is an automatic suppression feature that turns off a vehicle's front passenger seat air bag system when it determines that the front passenger seat is occupied by a child-sized occupant, a child seat, or is unoccupied. Thus, if the OCS determines that a person of adult size does not occupy the front passenger seat, it turns off the passenger-side air bag and illuminates the "PASSENGER AIR BAG OFF" light, which informs passengers that the air bag will not deploy. (*Id.*) Plaintiffs allege that Hyundai's OCS does not consistently recognize persons of small-stature-adult size, (*id.* ¶ 23), and that the OCS design causes the passenger-side air bag not to deploy in the event of an accident when such persons occupy the front passenger seat. (*Id.* ¶¶ 23-24.) The gravamen of Plaintiffs' claims is that Hyundai did not provide adequate notice of the defect, and that a Hyundai-initiated recall of Sonatas (model years 2006 through 2008) did not completely address the OCS issues. (*Id.* ¶¶ 63-71.)

On December 17, 2012, the Court conditionally certified a nationwide class and preliminarily approved the proposed settlement (the "Settlement" or "Settlement Agreement"). (Doc. 91.) Following the Court's preliminary approval of the parties' settlement, the parties' Claims Administrator issued notice to the class pursuant to the terms of the Settlement Agreement. (Settlement Mot. Mem. P. & A. at 10, Doc. 95.) Sixteen class members filed objections, and 179 vehicle owners have opted out. (Pls.' Suppl. Mem. at 1, Doc. 123.)

Under the proposed settlement, Hyundai will mail each class member a pamphlet describing the purpose of the OCS and its operation. The pamphlet is purportedly intended to help class members "optimize their experience with the OCS in their vehicles." The pamphlet will advise them: (1) with respect to correct seating positions; and (2) that the OCS is designed to favor protecting children. (Settlement Mot. Ex. 1 ("Settlement Agreement") ¶ 3.1.1.1; ¶ 3.1.2.1; ¶ 3.1.3.1; *id.* Ex. A ("OCS Customer Information

Pamphlet"), Doc. 95-1.)[1] Owners of Sonata Vehicles upon which the OCS recalibration has not already been performed will also receive a letter advising them of the available recalibration of the OCS. (*Id.* ¶ 3.1.1.1.)

As for the Santa Fe, pursuant to a term sheet executed by the parties, Hyundai agreed to launch a service action in which it would provide notice to each owner of a Santa Fe Vehicle to bring his or her vehicle to an authorized dealer for incorporation of the updated Santa Fe Vehicle OCS calibration software. (*Id.* ¶ 3.1.2.1.) After the execution of the term sheet, Hyundai voluntarily decided to make this OCS recalibration available to each owner of a Santa Fe Vehicle through a recall rather than a service action. (Pursuant to 49 C.F.R. § 573.6(b), Hyundai was required to notify the National Highway Trafffic Safety Administration ("NHTSA") of its decision to conduct the campaign as a recall within five days of that determination.) Pursuant to this recall, Hyundai will provide notice to each Santa Fe Vehicle owner by first-class mail to bring his or her vehicle to an authorized dealer for incorporation of the updated Santa Fe Vehicle OCS calibration. (*Id.* ¶ 3.1.2.1.)

Under the proposed settlement, Hyundai will mail to owners of Sonata Vehicles that were already incorporated in the Recall Campaign's recalibration a sticker designed to be affixed to the inside of the glove box door advising future owners that the OCS has been recalibrated.[2] (*Id.* ¶ 3.1.1.2.) Hyundai will also update the applicable Technical Service Bulletin to reflect that Hyundai dealers performing the OCS recalibration on Sonata Vehicles should apply a sticker to the inside of the glove box door (unless the owner objects, in which case it should be applied to the Owner's Manual) advising future owners that the OCS has been recalibrated. (*Id.* ¶ 3.1.1.3.)

---

[1] Those Class Members who have already had the recalibration performed on their Santa Fe vehicle will receive a different cover letter enclosing the OCS pamphlet that directs the Class Member to read the pamphlet. (*See* Joint Submission, Doc. 132; *id.* Ex. A.)

[2] Capitalized terms have the same meaning as provided in the Settlement Agreement.

The proposed settlement provides additional remedies for owners of certain Class Vehicles who remain unsatisfied with the OCS's performance. For owners of Sonata Vehicles that have received the OCS recalibration, Santa Fe Vehicles that have received the updated OCS calibration, and all Azera Vehicles ("Eligible Vehicles") who remain unsatisfied with the OCS's performance, Hyundai will have 90 days to endeavor in good faith to resolve the concerns of those owners ("Eligible Vehicle Owners"), provided that they contact Hyundai's Customer Connect Center within the later of: (a) 30 days after receiving the updated calibration or recalibration; or (b) 30 days following final approval of the class-action settlement. (*Id.* ¶¶ 4.1.1–4.1.3.) Hyundai's efforts are to include educating the Eligible Vehicle Owner with respect to correct seating positions, the OCS's compliance with federal safety standards, and the OCS's design. (*Id.* ¶ 4.1.3.) If the Eligible Vehicle Owner's concern remains unresolved and Hyundai believes that the Eligible Vehicle Owner has produced an adult passenger who (1) has previously been a passenger in the Eligible Vehicle; (2) weighs at least 108 pounds; and (3) is at least 16 years old, and the OCS judges that the passenger does not require the activation of the air bag system consistent with the design of the OCS (indicated by the extinguishment of the "Passenger Air Bag Off" light) after at least one of three "key on" cycles (the "Eligibility Criteria"), Hyundai will offer to refund the purchase price of the Eligible Vehicle. Hyundai may also offer to exchange, and at the Eligible Vehicle Owner's option will exchange, the Eligible Vehicle for another Hyundai model (the "Refund/Exchange Option"), subject to: (a) a mileage offset according to the Eligible Vehicle's mileage on the date of the offer; (b) a 120,000-mile vehicle lifespan; and (c) vehicle damage other than ordinary wear (the "Refund/Exchange Conditions"). (*See id.* ¶ 4.1.4.) This formula is based on California's "Lemon Law," California Civil Code § 1793.2.

Under the proposed settlement, if Hyundai is unwilling to give the Eligible Vehicle Owner the Refund/Exchange Option, and the concerns of the Eligible Vehicle Owner remain unresolved, the Eligible Vehicle Owner is entitled to initiate a proceeding before

the Better Business Bureau or a similar entity by calling a toll-free number within thirty days of the expiration of the ninety-day period Hyundai has to resolve his or her concerns. (*Id.* ¶ 5.1.)  Hyundai is obligated to pay all fees imposed by the entity conducting the arbitration.  (*Id.* ¶ 5.4.)  Pursuant to the proposed settlement, if the arbitrator finds that an Eligible Vehicle meets the Eligibility Criteria, the Eligible Vehicle Owner is entitled to the Refund/Exchange Option, subject to the Refund/Exchange Conditions (except that the mileage offset is calculated based on the date of the arbitration).  (*Id.* ¶ 5.2.)

Under the Settlement Agreement, class members agree to release Hyundai from all claims that arise from or relate to this lawsuit.  (*Id.* ¶ 10.1.)  The release expressly excludes claims for personal injury, damage to property other than the class member's vehicle, or any and all claims pertaining to anything other than the class member's vehicle.  (*Id.*) While the language of the release is fairly broad,[3] the parties' Joint Supplemental Memorandum of Law Regarding Settlement Administration and Class Members' Reactions to the Settlement makes clear that the release applies only to claims related to the OCS issue.  (*See* Joint Suppl. Mem. at 7-8, Doc. 121.)

The Settlement Agreement also provides that Hyundai will pay Plaintiffs' reasonable attorneys' fees in an amount to be separately negotiated and approved by the Court.  (*See* Settlement Agreement ¶¶ 9.1-9.5.)  The parties assert that they did not discuss attorneys' fees prior to or in connection with the execution of the Settlement Agreement. (Settlement Mot. at 10.)  Instead, they engaged in private mediation before a retired judicial officer on August 28, 2012.  (Settlement Mot. at 17.)  At the mediation, the parties

---

[3] Pursuant to the Settlement Agreement, class members "release, waive, and discharge the Releasees (as defined in Section 1), whether or not specifically named herein, from any and all past, present, and future liabilities, claims, causes of action (whether in contract, tort or otherwise, including statutory, common law, property, and equitable claims), damages, costs attorneys' fees, losses or demands, whether known or unknown, existing or potential, or suspected or unsuspected, which were or could have been asserted in the Litigation or in any other complaint, action or litigation in any other court or forum, including, without limitation, any and all claims relating to the transactions, actions, conduct or events that are the subject of the Litigation regarding the Class Vehicles ("Released Claims") . . . ."  (Settlement Agreement ¶ 10.1.)

agreed that Plaintiffs' counsel will move this Court for an award of: (1) reasonable attorneys' fees and expenses not to exceed a total sum of $993,000; (2) incentive payments totaling $10,000 for the four named Plaintiffs (i.e., $2,500 for each of the four named Plaintiffs). (*Id.* at 10.) Hyundai agreed to not oppose this award of attorneys' fees, expenses, and incentive payments.

# FINAL APPROVAL OF SETTLEMENT

## I. CLASS CERTIFICATION FOR THE PURPOSES OF SETTLEMENT

Where, as here, "the parties reach a settlement agreement prior to class certification, courts must peruse the proposed compromise to ratify both the propriety of the certification and the fairness of the settlement." *Staton v. Boeing Corp.*, 327 F.3d 938, 952 (9th Cir. 2008). The first step is to determine whether a class exists. *Id.* (citing *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 620 (1997)). In its Preliminary Approval Order, the Court discussed the propriety of conditional class certification for the purposes of settlement. The Court sees no reason to depart from its previous conclusions regarding the existence of a proper settlement class. Accordingly, the Court incorporates its class certification analysis from the Preliminary Approval Order into the instant Order

## II. LEGAL STANDARD

Before approving a class-action settlement, Rule 23 of the Federal Rules of Civil Procedure requires the Court to determine whether the proposed settlement is fair, reasonable, and adequate. Fed. R. Civ. P. 23(e)(2). "To determine whether a settlement agreement meets these standards, a district court must consider a number of factors, including: [1] the strength of plaintiffs' case; [2] the risk, expense, complexity, and likely duration of further litigation; [3] the risk of maintaining class action status throughout the trial; [4] the amount offered in settlement; [5] the extent of discovery completed, and the stage of the proceedings; [6] the experience and views of counsel; [7] the presence of a

1 governmental participant;[4] and [8] the reaction of the class members to the proposed settlement." *Staton*, 327 F.3d at 959 (internal citation and quotation marks omitted).

"The relative degree of importance to be attached to any particular factor will depend upon and be dictated by the nature of the claim(s) advanced, the type(s) of relief sought, and the unique facts and circumstances presented by each individual case." *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982). "It is the settlement taken as a whole, rather than the individual component parts, that must be examined for overall fairness, and the settlement must stand or fall in its entirety." *Staton*, 327 F.3d at 960 (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998) (quotation marks omitted)).

In addition to these factors, where "a settlement agreement is negotiated *prior* to formal class certification," the Court must also satisfy itself that "the settlement is not the product of collusion among the negotiating parties." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946-47 (9th Cir. 2011) (internal citation and quotations omitted). Accordingly, the Court must look for explicit collusion and "more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *Id.* at 947. Such signs include (1) "when counsel receive a disproportionate distribution of the settlement . . . ," (2) "when the parties negotiate a 'clear sailing' arrangement providing for the payment of attorneys' fees separate and apart from class funds . . . ," and (3) "when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund." *Id.*

## III.     DISCUSSION

A consideration of the above-enumerated factors favors final approval of the proposed settlement.

---

[4] This factor does not apply to this case.

### A. *Strength of Plaintiffs' Case*

The crux of Plaintiffs' claims is that Hyundai knew about and failed to disclose certain design defects in OCS. While Plaintiffs maintain that they would prevail at trial and upon any necessary appeal, Defendant "has raised and would continue to raise challenges to the legal and factual basis for such claims." (Settlement Mot. at 12.) Discovery in this case revealed "that the incidence of complaints concerning the operation of the OCS was very low generally, as measured by complaints to NHTSA in the form of Vehicle Owners' Questionnaires." (*Id.* at 4.) Specifically, the complaint rate was 0.041% for the Sonata (161 complaints in a vehicle population of 393,713). The complaint rate for the Santa Fe was 0.024% (67 complaints in a vehicle population of 277,608). (*Id.*) Finally, the complaint rate for the Azera was 0.012% (8 complaints in a vehicle population of 65,476). The low incidence of complaints supports the inference that Plaintiff may have had a difficult time proving its case at trial, and this fact weighs in favor of resolving this case pursuant to the proposed settlement.

The proposed settlement expands upon the recall campaign Hyundai started by extending it to additional vehicle owners and providing additional remedies (if needed) and informational materials. Thus, the Court is satisfied that the proposed settlement strikes a balance between Plaintiffs' claims and Defendant's defenses. The Court concludes that the parties' decision to reach a settlement in this matter was reasonable.

### B. *Likely Expense and Duration of Further Litigation*

Undoubtedly the expense incurred by Plaintiffs and the purported class will increase as the case progresses. This action has ensued for over three years, and neither side has brought dispositive motions. Thus, if settlement were not reached, Plaintiffs and potential class members would likely incur additional costs in conducting further discovery, defending or bringing dispositive motions, and, if applicable, preparing for and participating in trial. As this is a nationwide class, the expense of further litigation would

1  be substantial, and high expert costs alone would be expected.  (*See id.* at 13.)  The Court
2  finds that this factor favors approval of the Settlement Agreement.

### C. *Risk of Maintaining Class Certification*

The parties make passing reference to the risk of litigation, yet they do not provide the Court with any specific risks of maintaining class certification throughout the litigation.  Hence, the Court need not consider this factor for settlement purposes.  *See In re Veritas Software Corp. Sec. Litig.*, No. C-03-0283 MMC, 2005 WL 3096079, at *5 (N.D. Cal. Nov. 15, 2005) (favoring neither approval nor disapproval of settlement where the court was "unaware of any risk involved in maintaining class action status"), *aff'd in relevant part*, 496 F.3d 962 (9th Cir. 2007); *Murillo v. Pac. Gas & Elec. Co.,* No. CIV. 2:08-1974 WBS GGH, 2010 WL 2889728, at *7 (E.D. Cal. July 21, 2010) (favoring neither approval nor disapproval of settlement where the court was "unaware of any specific difficulty in maintaining class-action status were [the] case to continue to trial").

### D. *Amount Offered in Settlement*

The offered settlement is fair and, significantly, is directed at repairing the alleged harm.  *Cf. Hanlon*, 150 F.3d at 1027 ("The settlement presented to the district court obligates Chrysler to make the minivans safe.  This fact alone sets this case apart from [other cases] in which a settlement agreement was rejected in large measure because it did nothing to remedy the safety problem with the vehicles.").  Class members will receive additional materials informing them about the OCS (i.e., providing material information that Hyundai allegedly omitted).  Class members will be entitled to have their OCS fixed via recall.  If the recall does not fix the problem, and the class member so proves (at arbitration , if needed), the class member will be entitled to a refund of the vehicle price (subject to a reduction for wear and tear under California's Lemon Law), or a new Hyundai vehicle in exchange.

The recall campaign of the Santa Fe has cost Hyundai nearly $2.5 million in labor alone.  (Carey Decl. ISO Fees Mot. ¶ 2.)  This is one useful (and substantial) metric of the

1  value of the proposed settlement to the class.  While the Santa Fe recall campaign is not
2  contingent upon the Court finally approving the proposed settlement, Plaintiffs' counsel
3  have made a sufficient showing that their settlement negotiations with Hyundai resulted in
4  Hyundai agreeing to expand the recall to include the Santa Fe models.  (*See* Mem. P. & A.
5  ISO Fees Mot. at 1 n.2, Doc. 131; Carey Decl. ISO Fees Mot. ¶ 2.)
6       Moreover, the amount of the settlement is also fair, adequate, and reasonable in
7  light of the claims released by the participating class members and those class members
8  who fail to exclude themselves from the Settlement Agreement.  The proposed agreement
9  will release class members' claims only as related to their Class Vehicles, and does not
10 include damage for personal injury or to property other than the Class Vehicle.
11 (Settlement Agreement ¶ 10.1.)

### E.  *Extent of Discovery Completed*

13      This factor requires the Court to evaluate whether "the parties have sufficient
14 information to make an informed decision about settlement."  *Linney v. Cellular Alaska*
15 *P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998).  Discovery can be both formal and informal.
16 *See Clesceri v. Beach City Investigations & Protective Servs., Inc.*, No. CV-10-3873-JST
17 (RZx), 2011 WL 320998, at *9 (C.D. Cal. Jan. 27, 2011).  Here, Plaintiff's counsel
18 represents that the parties have engaged in formal and informal discovery during the two-
19 year litigation, and that Plaintiffs' counsel has conducted "independent investigations."
20 (Robert Carey Decl. I ¶ 6, Doc. 96.)  Furthermore, Plaintiffs' counsel represents that
21 during the extensive settlement negotiations, he "requested additional information from
22 [Hyundai] about the extent of complaints concerning the OCS," and that each time he was
23 "provided information on all matters about which [he] inquired."  (*Id.* ¶ 11.)  With the
24 above in mind, the Court finds that the parties had sufficient information to make an
25 informed decision about settlement.
26      The Court recognizes that settlement occurred before class certification or any other
27 dispositive motions were filed with the Court.  However, the parties have shown that they
28

have spent significant time investigating this action to allow for an informed decision, but not so much time that the settlement amount will be unnecessarily depleted by extensive costs and fees. As a result, the Court finds that this factor favors preliminarily approving the Settlement Agreement.

### F. *Experience and Views of Counsel*

Plaintiffs' counsel has substantial experience serving as class counsel, and they have fully endorsed the Settlement Agreement as fair, reasonable, and adequate. (Carey Decl. ¶¶ 2, 5 ("I believe that settlement of this action is appropriate and *in the best interests of Hyundai vehicle owners*" (emphasis added)).) This factor weighs in favor of preliminarily approving the Settlement Agreement.

### G. *Reaction of Class Members to Proposed Settlement*

Class members have reacted positively to the proposed settlement. Of the 646,734 recipients of the notice, the parties received letters from sixteen people objecting to the settlement and 179 letters (representing 186 vehicles) requesting exclusion from the settlement. Both of these figures are infinitesimal, 0.0025% and 0.0277%, respectively. One Class Member submitted a notice that she intended to speak at the fairness hearing but later withdrew that notice. (Pls.' Suppl Mem. at 1, Doc. 123.)

Moreover, the parties' responses to the few objections are well taken. (*See* Joint Suppl. Mem. at 2-8, Doc. 121.) For example, six objections complain about the mileage off-set the Settlement uses, both its clarity and its fairness. (*Id.* at 2-3.) However, this formula is taken from California's Lemon Law, Cal. Civ. Code § 1793.2, which is a "strongly pro-consumer" statute. *Murillo v. Fleetwood Enters.*, 17 Cal. 4th 985, 990 (1998).

The parties further represent that the "vast majority" of the opt-outs did not provide a reason for seeking exclusion from the settlement. Finally, Plaintiffs' counsel has provided twenty-one declarations from class members, all of whom support the settlement. Many are enthusiastic about the buyback/exchange program.

1 The Court concludes that this factor weighs in favor of approval.

## ATTORNEY'S FEES AND COSTS

Class counsel seeks $993,000 in attorneys' fees and costs.[5] The Settlement Agreement provides that the amount of attorneys' fees and expenses would be negotiated and agreed upon by the parties "only after reaching agreement on all other material terms of this settlement." (Settlement Agreement ¶¶ 9.1, 9.2.) Thus, after the parties entered into the Settlement Agreement, they mediated the issue of attorneys' fees, expenses, and incentive awards. Through mediation, the parties agreed that Class Counsel would seek, without opposition, $993,000 in attorneys' fees and costs.

As a threshold matter, the Court notes that the Federal Judicial Center, in its Manual for Complex Litigation, approves the parties' method of negotiating the settlement and then separately negotiating the attorneys' fees. *See* Manual for Complex Litigation (Fourth) § 21.7 (2004) ("Separate negotiation of the class settlement before an agreement on fees is generally preferable.").

Rule 23 permits a court to award "reasonable attorney's fees . . . that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). "[C]ourts have an independent obligation to ensure that the award, like the settlement itself, is reasonable, even if the parties have already agreed to an amount." *In re Bluetooth Headset Prods. Liability Litig.*, 654 F.3d 935, 941 (9th Cir. 2011). Because this is not a common fund

---

[5] Prior to the Fairness Hearing, the Court ordered the parties to provide supplemental briefing regarding the impact of *In re HP Inkjet Printer Litigation*, 2013 WL 1986396, at *1, which construes the Class Action Fairness Act's provisions governing "coupon settlements." (*See* Doc. 118.) CAFA does not define "coupon," and the *HP Inkjet* Litigation court did use broad language in describing coupons. *See HP Inkjet Printer Litig.*, 2013 WL 1986396, at *1 (explaining that the label placed on non-monetary relief is not dispositive of whether something is a "coupon"). However, the Court agrees with counsel for both parties that a coupon settlement is one "that provides benefits to class members in the form of a discount towards the future purchase of a product or service offered by the defendant." *Radosti v. Envision EMI, LLC*, 717 F. Supp. 2d 37, 54 n.16 (D.D.C. 2010). This is not such a case.

1  case, the Court calculates an award of attorneys' fees by first calculating the "lodestar."
2  *Hanlon*, 150 F.3d at 1029.

> The lodestar calculation begins with the multiplication of the number of hours reasonably expended by a reasonable hourly rate. The hours expended and the rate should be supported by adequate documentation and other evidence; thus, attorneys working on cases where a lodestar may be employed should keep records and time sheets documenting their work and time spent.

*Id.* (citation omitted).

The Ninth Circuit has identified a number of factors the Court may consider in assessing whether an award is reasonable and whether a departure from that figure is warranted, including: (1) the results achieved; (2) the risk of litigation; (3) the skill required and quality of work; and (4) the contingent nature of the fee and the financial burden carried by the plaintiffs. *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048-50 (9th Cir. 2002). These factors all weigh in favor of awarding attorneys' fees in the amount of $150,000.

Based upon the attorney billing records in this case, Plaintiffs' counsel (and administrative staff) have worked 1,864.8 hours in this case, including 368.2 hours worked by Robert Carey, an attorney with more than twenty years of experience. (Suppl. Carey Decl. ISO Fees Mot. ¶ 3, Doc. 133.) The Court finds these hours are reasonable given the detailed time sheets that Plaintiffs' Counsel has submitted. (*See id.* Ex. A.)

Plaintiffs' counsel and staff expect to bill another 535 hours through the remainder of the litigation. (*Id.* ¶ 7.) Thus, Plaintiffs' counsel estimates a total of 2,399.8 hours.

The hourly rates that Plaintiffs' Counsel (and staff) charge range from $100 an hour for Aniela Wisniewski to $800 an hour for Steve Berman and $650 for Robert Carey. (Suppl. Carey Decl. ISO Fees Mot. at 2.) In assessing a reasonable hourly rate for the lodestar figure, courts look to the prevailing hourly rate in the relevant community. *Camacho v. Bridgeport Fin. Inc.*, 523 F.3d 973, 979 (9th Cir. 2008). Thus, courts look to

1  the "rate prevailing in the community for similar work performed by attorneys of
2  comparable skill, experience, and reputation." *Id.* (internal quotation marks omitted.)
3  "[T]he burden is on the fee applicant to produce satisfactory evidence—in addition to the
4  attorney's own affidavits—that the requested rates are in line with those prevailing in the
5  community for similar services by lawyers of reasonably comparable skill, experience and
6  reputation. *Id.* (internal quotation marks omitted.) Plaintiffs' counsel have met their
7  burden with affidavits, case law[6], and even the National Law Journal's 2012 Law Firm
8  Billing Survey. (*See* Mem. P. & A. ISO Fees Mot. at 13-14.)

9        This yields a loadstar amount of $776,707.50 through June 19, 2013.[7] With the
10 additional anticipated hours, the total loadstar is $922,605.00. "The resulting figure may
11 be adjusted upward or downward to account for several factors including the quality of the
12 representation, the benefit obtained for the class, the complexity and novelty of the issues
13 presented, and the risk of nonpayment." *Hanlon*, 150 F.3d at 1029.

14       Through the filing date of their Fees Motion, Plaintiffs' counsel have expended
15 $47,419.10 in costs. The invoices provided substantiate this amount. (*See* Suppl. Carey
16 Decl. ISO Fees Mot. Ex. A.) Plaintiffs' counsel also expects to incur an additional
17 $10,500 in expenses before the conclusion of this litigation for items such as photocopies,
18 telephone calls, and correspondence with class members concerning participation in the
19 refund/exchange program and arbitration. (Suppl. Carey Decl. ISO Fees Mot. at 4.)

20       The Court finds that the work of counsel thus far and the results they have obtained
21 support awarding the requested fees and expenses for the period through June 19, 2013.

---

[6] "Courts may find hourly rates reasonable based on evidence of other courts approving similar rates or other attorneys engaged in similar litigation charging similar rates." *Parkinson v. Hyundai Motor Am.*, 796 F. Supp. 2d 1160, 1172 (C.D. Cal. 2010).

[7] Plaintiffs' counsel's original Fees Motion referenced figures through April 30, 2013. (*See* Mem. P. & A. ISO Fees Mot; Cary Decl. ISO Fees Mot.) At the fairness hearing, the Court permitted counsel to file a supplemental declaration listing their updated fees and expenses. That supplemental declaration lists fees and costs through June 19, 2013. (*See* Suppl. Carey Decl. ISO Fees Mot.)

1  The quality of the representation and the results obtained in this case led to a substantial
2  expansion upon the recall Hyundai had originally undertaken—namely, the addition of the
3  Santa Fe model to the recall campaign.  (*See* Mem. P. & A. ISO Fees Mot. at 1 & n. 2.)
4  The Settlement makes available: (1) an OCS recalibration in most of the Class Vehicles
5  (594,000 Sonatas and Santa Fes); (2) a sticker providing notification of the recalibration of
6  the vehicles; (3) the potential vehicle buyback or exchange program; and (4) an arbitration
7  to determine buyback/exchange eligibility.  Through January 23, 2013—the most recent
8  data available—Hyundai had recalibrated 82,070 Santa Fes, which cost nearly $2.5 million
9  in labor alone.  (Carey Decl. ISO Fees Mot. ¶ 2.)  Moreover, this is a nationwide class
10 action that was vigorously defended by skilled counsel and required analysis of complex
11 technical systems.  All counsel on this case worked on a contingency fee basis, which
12 created significant risks for counsel given the amount of hours they worked and the legal
13 uncertainty they faced.
14     Accordingly, the Court approves the request for attorneys' fees in the amount of
15 $776,707.50 and costs in the amount of $47,419.10.
16     The Court cannot, however, grant Plaintiffs' counsel's request for expected future
17 fees and costs.  First, Plaintiffs' counsel still have, as they anticipate, significant work to
18 perform in navigating Class Members through the settlement process, including, if
19 applicable, the buyback/exchange program and an attendant arbitration.  Given the
20 importance of this work, the Court cannot prejudge the quality of the work still to be
21 performed.
22     Moreover, more than a fifth of the amount counsel seek is based on expected future
23 work.  Yet the Ninth Circuit requires substantiation of work performed.  *See Hanlon*, 150
24 F.3d at 1029 ("The hours *expended* and the rate should be supported by adequate
25 documentation and other evidence; thus, attorneys working on cases where a lodestar may
26 be employed *should keep records and time sheets* documenting their work and *time spent*."
27 (emphases added)).  As the Court explained at the hearing, it is premature to award nearly
28

16

$150,000 in fees and $10,500 in costs that counsel *anticipate* incurring. Here, it is appropriate for the fees and costs to be bifurcated. *See HP Inkjet Printer Litig.*, 2013 WL 1986396, at *10 n. 19 ("a fees award can be bifurcated or staggered to take into account the speculative nature of at least a portion of a class recovery").

After this litigation has been concluded, Plaintiffs' counsel may apply for fees and costs for the period after June 19, 2013, and they may submit a proposed amended judgment to that effect.

## ENHANCEMENT TO THE CLASS REPRESENTATIVE

Plaintiffs' counsel moves for a $2,500 service award for each of the four class representatives. (Mem. P. & A. ISO Fees Mot. at 11-13, 14.) District courts have the discretion to award incentive payments to named plaintiffs as compensation for their actions taken on behalf of the class. *Stanton*, 327 F.3d at 977; *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 463 (9th Cir.2000). The Ninth Circuit recently emphasized that district courts must "scrutinize[e] all incentive awards to determine whether they destroy the adequacy of class representatives." *Radcliffe v. Experian Info. Solutions Inc.*, No. 11-56376, --- F.3d ----, 2013 WL 1831760, at *5 (9th Cir. May 2, 2013).

In light of all the facts, the Court concludes that Plaintiffs are entitled to the $2,500 incentive award. Class counsel avers that the class representatives have made themselves available throughout the litigation, providing information and assisting in other ways. (Carey Decl. ISO Fees Mot. ¶¶ 8-9.) Moreover, at least one class representative undertook to assist in fact investigation. (*Id.* ¶ 8.) Accordingly, the Court approves the $2,500 service award to the four class representatives. *Cf. Rausch v. Hartford Fin. Servs. Grp.*, No. 01-CV-1529-BR, 2007 WL 671334 (D. Or. Feb. 26, 2007) (granting $10,000 incentive fee award).

**CONCLUSION**

For the foregoing reasons, the Court GRANTS Plaintiffs' Settlement Motion. The Court GRANTS IN PART their Fees Motion. The Court awards $776,707.50 in attorneys' fees for the period through June 19, 2013. The Court awards Plaintiffs' counsel $47,419.10 in costs. The Court awards each of the four Plaintiffs $2,500 as an incentive award.

After the conclusion of this litigation and administration of the settlement process, Plaintiffs' counsel may apply for their fees and costs from the period after June 19, 2013, through the resolution of this case, and they may submit a proposed amended judgment to that effect.

The parties shall file a proposed judgment in conformity with this Order forthwith.

DATED: June 28, 2013

_____
JOSEPHINE STATON TUCKER
UNITED STATES DISTRICT JUDGE